[Cite as *In re A.J.*, 2019-Ohio-593.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| A.J. | : | CASE NO. CA2018-08-063 |
| | : | O P I N I O N<br>2/19/2019 |
| | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2017JC04962

D. Vincent Faris, Clermont County Prosecutor, Nick Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Dever Law Firm, Scott A. Hobert, 9146 Cincinnati-Columbus Road, West Chester, Ohio 45069, for appellant

**RINGLAND, P.J.**

{¶ 1} Appellant, the mother of A.J. ("Mother"), appeals from the decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter to appellee, the Clermont County Department of Job and Family Services ("CCDJFS"). For the reasons outlined below, we affirm the juvenile court's permanent custody determination.

**Facts and Procedural History**

{¶ 2} On April 11, 2017, CCDJFS filed a complaint alleging A.J., born December 1,

2010, was a dependent child. In support of its complaint, CCDJFS noted that it had been involved with A.J. and her family for nearly six months beginning in November 2016. This involvement began after CCDJFS received reports that there was limited to no food in the family home where A.J. was residing with her father ("Father"). CCDJFS had also received reports that Father was using illegal drugs. It is undisputed that at the time the complaint was filed Mother had been in prison for over a year serving a four-year prison term upon being convicted of burglary and tampering with evidence. It is also undisputed that Mother had served an earlier 14-month prison term approximately one year after giving birth to A.J. after she was found guilty of grand theft and fleeing and eluding.

{¶ 3} While investigating the reports regarding the family's home and Father's illegal drug use, CCDJFS conducted a drug screen on Father. The drug screen came back positive for 6-Monoacetylmorphine (6-MAM) and morphine, the metabolites of heroin. Following his positive drug screen, Father agreed to cooperate with CCDJFS regarding the care of A.J. A safety plan was then established removing A.J. from Father's care. Father was then admitted into an inpatient rehabilitation facility to address his substance abuse problems.[1]

{¶ 4} Unfortunately, after being removed from Father's care, CCDJFS learned that A.J.'s then foster family would be unable to continue caring for her. As a result, due to the uncertainty regarding the health and well-being of both A.J. and Father, CCDJFS moved the juvenile court for emergency temporary custody. The juvenile court granted CCDJFS's request later that same day. The juvenile court then appointed A.J. with a guardian ad litem.

---

1. The record indicates Father was unsuccessfully discharged from his initial inpatient rehabilitation facility only to be admitted into another rehabilitation facility two weeks later. The record does not contain any information as to whether Father was successfully discharged from that second facility.

{¶ 5}   On June 1, 2017, a juvenile court magistrate adjudicated A.J. a dependent child.  The juvenile court adopted the magistrate's decision adjudicating A.J. a dependent child on June 19, 2017.  Approximately three weeks later, on July 11, 2017, the magistrate issued a dispositional decision granting temporary custody of A.J. to CCDJFS.  The record indicates Father consented to the magistrate's dispositional decision placing A.J. in CCDJFS's temporary custody.   On July 31, 2017, the juvenile court adopted the magistrate's decision granting temporary custody of A.J. to CCDJFS.

{¶ 6}   On August 17, 2017, the juvenile court held a hearing on the matter.  Following this hearing, the juvenile court issued an entry noting that Father had overdosed on heroin and died sometime after the magistrate issued its dispositional decision on July 11, 2017.  The record indicates Father died on July 14, 2017, three days after the magistrate issued its dispositional decision granting temporary custody of A.J. to CCDJFS.

{¶ 7}   In addition to these findings, the juvenile court noted that Mother was still in prison with an anticipated release date of November 2019.  The juvenile court also noted that A.J. was then in the process of being placed with her paternal second-cousin and his wife.  Concluding, the juvenile court noted that a home study of the cousin's home had passed with "no other family members appropriate or suitable.  They want to be licensed as foster to adopt parents.  [A.J.] doing well and started grief counseling[.]"

{¶ 8}   On December 14, 2017, the juvenile court held another hearing on the matter.  Following this hearing, the juvenile court issued an entry noting that CCDJFS was planning on moving for permanent custody of A.J.  The juvenile court also noted that A.J. had since been placed with her paternal second-cousin and his wife.  The juvenile court further noted that A.J. likes her current placement with her cousin, that A.J. had been attending grief counseling to address any issues resulting from her Father's overdose death, and that A.J. had made a few new friends since being placed with her cousin.

{¶ 9} On February 12, 2018, CCDJFS moved for a six-month extension of temporary custody. In support, CCDJFS noted that Mother was still incarcerated but had an early potential judicial release date of February 10, 2019. CCDJFS also noted that Mother had not been placed on a case plan and had not otherwise engaged in any case plan services. CCDJFS further noted that A.J. was "doing well" in her current placement with her paternal second-cousin and his wife who were "in the process of becoming licensed to adopt and would like to adopt A.J." The guardian ad litem filed a similar report noting that A.J. "likes her home and her room" and "appeared to be very happy and well adjusted in her current situation."

{¶ 10} On March 1, 2018, CCDJFS moved for permanent custody of A.J. In support of its motion, CCDJFS alleged Mother had abandoned A.J. by not having had any face-to-face contact with A.J. for nearly two years. CCDJFS also noted that Mother "has been in prison since March of 2016 and is currently serving a three year mandatory prison sentence in Clermont County Court of Common Pleas case No. ___ -CR- ___ consecutively with a 12 month prison term in Clermont County Court of Common Pleas case No. ___ -CR- ___."[2] Concluding, CCDJFS alleged that A.J. cannot and should not be placed with Mother within a reasonable period of time and that A.J.'s best interest would be served by an award of permanent custody. The matter was then scheduled for a hearing on CCDJFS's motion for permanent custody on May 4, 2018.

{¶ 11} On March 30, 2018, Mother moved for a continuance of the permanent custody hearing due to her then pending motion for early judicial release. Anticipating that she would be granted early judicial release, Mother made this request in hopes that CCDJFS would place her on a case plan and allow her to start receiving case plan services.

___

2. This court has removed the specific case numbers to protect the identities of the parties.

This, according to Mother, would allow her to be reunified with A.J. upon her release from prison or shortly thereafter. The matter was then scheduled for a hearing on Mother's motion. However, after her request for judicial release was denied, Mother filed a notice withdrawing her request for a continuance "on the basis of her being released within a reasonable time."

{¶ 12} On May 4, 2018, a hearing on CCDJFS's motion for permanent custody was held before the juvenile court magistrate. As part of this hearing, the magistrate heard testimony from Mother (who was conveyed from prison to testify at the hearing), as well as A.J.'s paternal second-cousin and his wife. The magistrate also heard testimony from an ongoing caseworker from CCDJFS and an adoption coordinator. This testimony indicated A.J. was doing very well and making great progress now that she was under the care of her cousin and his wife, who the record indicates A.J. refers to as "mom" and "dad."

{¶ 13} Specifically, as A.J.'s cousin testified when asked how A.J. was doing in he and his wife's care:

> Fantastic. She's blossoming, learning. She seems like a completely different child than the one that came to live with us, as far as her social interactions go and conversations that she has. * * * She was very sheltered, anxious. She seemed distrustful of a lot of people. And since then she seems very comfortable and she gets very excited to spend family time with my family and [my wife's] family. She enjoys doing things like going to dance and making friends and going to school events.

A.J.'s cousin also testified that he and his wife were taking the necessary steps to adopt A.J., that they are 100% bonded to her, and that they would "love" to adopt A.J. if given the opportunity.

{¶ 14} Following this hearing, the magistrate issued a detailed 13-page decision granting CCDJFS's motion for permanent custody. Of note, the magistrate stated:

> Mother estimates she needs at least three months [upon her release from prison] to be ready to care for [A.J.] Three months

is overly optimistic. Mother's job history is remote. Her felony record will impair her employability. She has no financial resources and cannot drive. She needs to complete drug treatment and demonstrate solid sobriety outside of prison. Her sobriety is not guaranteed. Mother is out of time. The Magistrate is unwilling to gamble [A.J.'s] present need for permanency against Mother's mere promise of future stability.

{¶ 15} On July 6, 2018, Mother filed an objection to the magistrate's decision claiming the magistrate's decision granting CCDJFS's motion for permanent custody was not in A.J.'s best interest. After reviewing the pertinent statutory provisions, case law, testimony, exhibits, and case file, the juvenile court found the magistrate's decision was supported by sufficient evidence and not against the manifest weight of the evidence. In so holding, the juvenile court found "the testimony presented by the agency's witnesses to be credible based upon a review of the transcripts." The juvenile court also found that "in weighing the evidence that there is substantial credible evidence that is both clear and convincing to terminate parental rights and to award permanent custody to the Clermont County Department of Job and Family Services."

**Appeal**

{¶ 16} Mother now appeals from the juvenile court's decision granting CCDJFS's motion for permanent custody. In support, Mother raises a single assignment of error arguing the juvenile court's decision to grant permanent custody was not supported by sufficient evidence. Mother also argues in her single assignment of error that the juvenile court's decision was against the manifest weight of the evidence. Under these circumstances, this court applies the following standard of review.

**Standard of Review**

{¶ 17} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been

met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 18} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Case Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

**Two-Part Permanent Custody Test**

{¶ 19} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**Reasonable Time**

{¶ 20} As it relates to the second part of the two-part permanent custody test, the juvenile court found A.J. could not be placed with Mother within a reasonable time due to the fact she was then in prison serving a four-year prison term. Mother disputes this finding claiming A.J. could be placed with her within a reasonable time since her anticipated release

date from prison will occur "within two years of this case being opened."[3]  However, even assuming Mother was correct in her assertion, R.C. 2151.414(E)(12) requires the juvenile court to find a child cannot be placed with a parent within a reasonable time if the "parent is incarcerated at the time of the filing of the motion for permanent custody * * * and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody[.]"  Therefore, based on the plain language found in R.C. 2151.414(E)(12), the juvenile court was required to find A.J. could not be placed with Mother within a reasonable time if Mother would still be incarcerated 18 months after CCDJFS filed its motion for permanent custody.

{¶ 21} The motion for permanent custody was filed by CCDJFS on March 1, 2018. The record indicates Mother now has an anticipated release date from prison on November 9, 2019.  This is a difference of 20 months and eight days.  Because Mother will presumably still be in prison 18 months after CCDJFS's motion for permanent custody was filed, the juvenile court was required by R.C. 2151.414(E)(12) to find A.J. could not be placed with her within a reasonable time.  That is exactly what the juvenile court did here.  The juvenile court did not err in reaching this decision.

{¶ 22} In so holding, we note that contrary to Mother's claim, R.C. 2151.414(E)(12) "does not create a mechanism for an incarcerated parent to delay proceedings while [s]he completes [her] sentence." *In re A.A.*, 6th Dist. Lucas No. L-17-1162, 2017-Ohio-8705, ¶ 25.  That is certainly the case here when considering Mother's inability to properly care for A.J. would likely continue for many months if not years following her release from prison. *See In re A.J.*, 6th Dist. Lucas No. L-16-1258, 2017-Ohio-1392, ¶ 29 (appellant's

---

3. As discussed more fully below, R.C. 2151.353(G) prohibits CCDJFS from maintaining temporary custody of A.J. for longer than two years after the complaint was filed.  This case was opened after CCDJFS filed a complaint alleging A.J. was a dependent child on April 11, 2017.  Mother's anticipated release date is November 9, 2019.  Mother is therefore incorrect in her assertion that her anticipated release date will occur "within two years of this case being opened."

unavailability to care for her child would "continue even following her release from prison because appellant would need to reestablish her life by, at a minimum, finding housing and a source of income before being able to parent the child"). Therefore, due to the plain language found in R.C. 2151.414(E)(2), we find no error with the juvenile court's decision as it relates to the second part of the two-part permanent custody test.

**Best Interest of the Child**

{¶ 23} Turning now to the first part of the two-part permanent custody test, the juvenile court found it was in A.J.'s best interest to grant permanent custody to CCDJFS. Mother disputes this finding by arguing the juvenile court's decision was not supported by sufficient evidence. Mother also argues the juvenile court's decision was against the manifest weight of the evidence. We disagree.

{¶ 24} When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. The juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial

court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶ 25} Initially, with respect to A.J.'s relevant interactions and relationships with those who may significantly impact her young life, the juvenile court found Mother, an admitted heroin addicted, started using heroin shortly after giving birth to A.J. This is confirmed by Mother's own testimony elicited at the permanent custody hearing, wherein Mother testified:

> [THE STATE]: So have you been sober at any point since your daughter has been born?
>
> [MOTHER]: When she was born, I was sober the whole time. I mean when I was pregnant. And then for not quite a year I was sober, but then I started using pretty bad.

{¶ 26} As a result of her heroin addiction, the juvenile court found Mother has now spent over half of A.J.'s life in prison after she was convicted of grand theft auto, fleeing and eluding, burglary, and tampering with evidence. Once again, this is confirmed by Mother's testimony. As Mother testified:

> [MOTHER'S TRIAL COUNSEL]: Okay. So the first time you went to prison, how long was that for?
>
> [MOTHER]: Fourteen months.
>
> [MOTHER'S TRIAL COUNSEL]: And then you got out for four months, roughly, and then –
>
> [MOTHER]: I was using again within probably two months. And I – I burglarized a house and I got put back in prison.

Thereafter, when asked by the state if she had either been strung out on heroin or in prison since A.J. was born, Mother responded, "Yes."

{¶ 27} The juvenile court also found that while Mother had sent letters to A.J., A.J. did not respond to Mother's letters and generally appeared to have little to no interest in doing so. The juvenile court further found that Mother had not seen A.J. face-to-face since

she was sent back to prison after she was found guilty of burglary and tampering with evidence over two years earlier. This, according to the juvenile court, "does not bode well for maintaining a bonded relationship."

{¶ 28} In addition to these findings, the juvenile court found A.J.'s paternal grandfather and his wife have visited with A.J. However, as it relates to A.J.'s maternal grandmother, the juvenile court found nothing to indicate she had a relationship with A.J. or that maternal grandmother had even visited A.J. during the pendency of this case. The juvenile court also found that most of A.J.'s half-siblings, except one, had not maintained any contact with A.J. since she was placed in the temporary custody of CCDJFS. This is true even though one of A.J.'s half-siblings was present as an observer at the hearing on CCDJFS's motion for permanent custody.

{¶ 29} Turning to A.J.'s interaction and relationship with her paternal second-cousin and his wife, the juvenile court found A.J. had been in their care since August 17, 2017. The juvenile court also found A.J. to be bonded to them. This includes, as noted above, A.J. referring to her cousin and his wife as "mom" and "dad." The juvenile court further found that since being placed in her cousin's care that A.J. has "become more open in her social interactions."

{¶ 30} The record indicates that A.J. has also had the opportunity to engage in activities with her extended family since being placed in her cousin's care. The record further indicates that A.J. had become involved in dance classes and was improving academically since being removed from Father's care and placed with her cousin. The juvenile court finally noted that A.J.'s cousin was "receptive to A.J. visiting with relatives, including the mother upon her release, as long as it is in A.J.'s best interest."

{¶ 31} Next, regarding A.J.'s wishes, the juvenile court relied on the guardian ad litem's report and recommendation that permanent custody of A.J. should be granted to

CCDJFS. The guardian ad litem based her recommendation, at least in part, on A.J. expressing her desire to stay with her paternal second-cousin and his wife "forever." This, according to the guardian ad litem, was due to A.J. feeling "safe and secure" with them. Specifically, as the guardian ad litem stated in her report:

> The child expressed to this GAL that "she loves her placement family very much and she wants to stay with them forever." AJ states she loves grandma and grandpa too.[4] AJ reports she believes her dad (now deceased) brought her to this family so she would be loved and cared for. AJ states she loves having a "family." AJ asked this GAL to tell the Judge that she feels safe and secure with her current family. These are AJ's wishes.

The guardian ad litem also noted that A.J. remembers very little about Mother – except for Mother doing laundry – and that A.J. reported that "my Mom is in jail because she does bad things."

{¶ 32} In addition, as it relates to A.J.'s custodial history, the juvenile court found A.J. had been in the temporary custody of CCDJFS since April 11, 2017. Mother does not dispute this finding.

{¶ 33} Furthermore, when considering A.J.'s need for a legally secure placement, the juvenile court found A.J.'s need for a legally secure permanent placement could not be achieved without a grant of permanent custody to CCDJFS. In support, the juvenile court noted that A.J. was fearful that if Mother regained custody of her that Mother would soon "become incarcerated again." The juvenile court also noted that "[A.J.] is also afraid of being taken from the home in which she is currently residing and being placed otherwise." The juvenile court further found that there was no way to predict when, or even if, Mother would be able to maintain her parental duties upon her release from prison. The juvenile court based its decision on the following:

> Upon mother's release from prison, she will have an uphill battle

_____

4. The record indicates the grandparents A.J. was referring to were her cousin's wife's family.

to put her life back together in a number of areas. She will need to obtain and maintain housing, which will be difficult due to a lack of financial resources. She also has outstanding obligations stemming from her criminal offenses. She will need to secure and maintain a job, which may prove difficult because she has not held a job since 2014. She will need to establish a track record which proves that she can remain drug-free outside prison walls. She will need to re-establish a relationship with A.J., if possible, and would be required to engage in "one-on-one" parenting classes. The Court is not willing to gamble on the child's future in order to give the mother an indefinite period of time to accomplish these goals.

{¶ 34} The juvenile court then reiterated that A.J.'s paternal second-cousin and his wife had expressed their desire to adopt A.J. if she became available for adoption. The juvenile court also noted the following in regard to the impact A.J.'s current placement had on her development:

In their home, the child can feel the security which she has been deprived of for far too long. If she were to be adopted by her caregivers, then she could have the much-needed security of knowing that she has a stable home and enduring relationship with her caregivers. The child has improved her reading skills in the current household. She receives the therapy she needs and has a chance to socialize with extended family. It appears that the current caregivers are meeting all her present needs, whether they be physical, educational, or emotional.

On the other hand, as it relates to any other potential familial placements, the juvenile court found none of A.J. relatives had moved the juvenile court to obtain legal custody.

{¶ 35} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court found none of the factors applied.

**Analysis**

{¶ 36} After a thorough review of the record, we find the record fully supports the juvenile court's decision to grant CCDJFS's motion for permanent custody. Mother nevertheless disputes the juvenile court's decision. In support, Mother initially argues that, rather than granting permanent custody, it was in A.J.'s best interest continue the case until

she was released from prison. This, according to Mother, would allow her to have the opportunity to prove she could adequately provide for A.J. But what Mother fails to consider is the juvenile court's requirements set forth by R.C. 2151.353(G). Pursuant to that statute, "the [juvenile] court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier[.]"

{¶ 37} This case was opened after CCDJFS filed a complaint alleging A.J. was a dependent child on April 11, 2017. A.J. was placed in the emergency temporary custody of CCDJFS later that same day. The record indicates Mother's anticipated release date from prison is November 9, 2019. This, as noted above, is a difference of 20 months and eight days. Although we presume unintentionally, Mother is essentially arguing that the juvenile court should have disregarded the General Assembly's mandate as set forth in R.C. 2151.353(G) and continue this matter to some unspecified time after she was released from prison. Given the fact that both the juvenile court and this court alike are bound to apply the law as written, it should go without saying that we disagree with Mother's position.

{¶ 38} Moreover, even assuming there had been sufficient time to extend temporary custody until after Mother was released from prison, the juvenile court has authority to extend temporary custody only if it found by clear and convincing evidence that: (1) the extension was in A.J.'s best interest; (2) there had been "significant progress" on Mother's case plan services; and (3) there was "reasonable cause to believe" A.J. would be reunified with Mother or otherwise permanently placed within the period of extension. *See* R.C. 2151.415(D)(1). When considering the juvenile court found it was in A.J.'s best interest to grant CCDJFS's motion for permanent custody, we find it highly unlikely the juvenile court would have instead found it was in A.J.'s best interest to continue this case to some unspecified time after Mother was released from prison.

**{¶ 39}** That being said, given the facts of this case, it is clear that Mother was given ample opportunity to prove she could adequately provide for A.J. in the year after giving birth. Yet, when given the chance to demonstrate her commitment to A.J., Mother was instead admittedly "strung out on heroin" and "had been for like a few years, at least four years." This ultimately resulted in Mother being sent back to prison to serve a four-year prison term after she was found guilty of burglary and tampering with evidence.

**{¶ 40}** Children are entitled to have stability in their lives by being placed in a legally secured permanent placement. *See In re J.B.*, 12th Dist. Butler No. CA2018-08-175, 2018-Ohio-5049, ¶ 35; *see also In re S.M.*, 2019-Ohio-198 at ¶ 37. A child's life is not an experiment that can be left to chance. Therefore, contrary to Mother's claim otherwise, A.J. cannot simply wait idly by in hopes that Mother will not relapse upon her release from prison. Such concerns are further exacerbated by the fact Mother admittedly relapsed only two months after first being released from prison. Of further concern is Mother's lack of employment, income, savings, driver's license, functioning vehicle, and housing, as well as the fact Mother still owes fines, costs, and $4,591 in restitution resulting from her most recent conviction for burglary and tampering with evidence.

**{¶ 41}** Mother claims she would be back on her feet within three months of her release from prison. This, according to Mother, was due to her involvement with the various services being provided to her in prison. However, "simply because [Mother] claims that, while imprisoned, she has substantially remedied the conditions that led to the child's removal does not mean that the [juvenile] court was required to afford [Mother] a reasonable time to prove that she would be able to properly care for the child upon her release." *In re M.M.*, 4th Dist. Meigs No. 14CA6, 2014-Ohio-5111, ¶ 33. Mother's past behavior is a better indicator than her current promises that she would maintain her sobriety upon her release from prison. Considering Mother admittedly relapsed only two months after first being

released from prison, although we certainly hope this is not the case, the likelihood that Mother suffers yet another relapse is high.

{¶ 42} "A juvenile court 'is not required to deny [a] permanent custody motion simply based upon the groundless speculation that the mother might successfully complete her drug treatment * * * and remain drug-free.'" *In re E.F.*, 12th Dist. Clinton Nos. CA2016-03-003 thru CA2016-03-007, 2016-Ohio-7265, ¶ 36, quoting *In re J.C.*, 4th Dist. Adams No. 07CA834, 2007-Ohio-3783, ¶ 25. This is because, as this court has stated previously, "when dealing with the life of a young child, such as the case here, the juvenile court cannot, and should not, blindly accept one's claims of self-healing without some type of verification." *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 29. Mother's claim otherwise lacks merit.

{¶ 43} Nevertheless, even if we were to find reasonable Mother's claim that it would take her only three months to get back on her feet, simply because Mother may have the ability to provide for A.J. does not mean it would be in the child's best interest to be placed in Mother's care. The juvenile court, just like this court, must act in a manner that places A.J.'s best interests above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2012-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant permanent custody to CCDJFS in this case does just that. Therefore, because A.J. is now thriving in a stable and secure environment with her paternal second-cousin and his wife, the juvenile court's decision to grant permanent custody in this case was proper.

{¶ 44} Mother next argues it was improper for the juvenile court to grant permanent custody to CCDJFS when considering she "was not provided any services by the agency

in order to remedy the situation." Mother, however, was in prison during the pendency of this case. This significantly limits, if not outright negates, CCDJFS's ability to provide Mother with any case plan services. Yet, even then, as the ongoing caseworker testified, Mother would still need to complete services "outside in the community" once she was released from prison before reunification could occur. This is because, as the ongoing caseworker testified, "[i]t is a completely different environment in prison than it is being out in the community." We agree with the caseworker's testimony and find nothing improper about CCDJFS's decision not to include Mother on a case plan or provide Mother any case plan services while she was in prison.

{¶ 45} In so holding, we note that due to Mother's current incarceration, there is only so much that CCDJFS could provide to Mother. The efforts towards reunification undertaken by CCDJFS in this case were certainly reasonable and in no way indicative of a lack of commitment to A.J. or Mother when considering A.J.'s best interest. CCDJFS should not be expected to go to any greater lengths to help Mother than it would any other parent who was not incarcerated. This is true even though Mother was, at least arguably, not directly at fault in creating the circumstances that led to A.J. being removed from the family home while under Father's care. Mother was in prison due to her actions and her actions alone, not for anything that could in any way be attributed to CCDJFS. Mother must deal with the repercussions of her actions both inside and outside of prison. That includes the possibility of losing custody of A.J. permanently.

{¶ 46} Mother finally argues the juvenile court erred by granting permanent custody to CCDJFS rather than "seeking a relative placement prior to permanent commitment." This court is confounded by Mother's argument considering A.J. was – and presumably still is – in the care of her paternal second-cousin and his wife. But, even setting aside this confusion, the record is clear that none of A.J.'s relatives moved the juvenile court for legal

custody. A juvenile court is prohibited from awarding legal custody to any person who did not timely move the juvenile court to make such an award. *In re L.R.T.*, 165 Ohio App.3d 77, 2006-Ohio-207, ¶ 13 (12th Dist.) (juvenile court erred by awarding legal custody to a child's great-aunt who did not file a motion for legal custody prior to the dispositional hearing); Juv.R. 34(D)(3) (juvenile court may issue an order of disposition awarding legal custody of child who has been adjudicated an abused, neglected, or dependent child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody"). To hold otherwise would throw further disarray in the already difficult process a juvenile court faces in determining what is in the best interest of a child in permanent custody proceedings.

### Conclusion

{¶ 47} The juvenile court did not err in its decision to grant CCDJFS permanent custody of A.J. This is because, as discussed more fully above, the juvenile court's decision to grant permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence. As this court has stated previously, a parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the children's removal. *In re A.W.*, 2014-Ohio-3188 at ¶ 23. Given the fact that Mother faces significant hurdles upon her release from prison, the juvenile court properly found that it was in A.J.'s best interest to grant CCDJFS's motion for permanent custody.

{¶ 48} In reaching this decision we note that Mother herself testified she can make no guarantees that she will not revert back to using heroin upon her release from prison. As Mother testified, "I can't guarantee it, no. I would be silly to sit up here and say, I can guarantee I'll never use when that might not be true." Under these circumstances, rather than gambling on Mother's success or failure upon her release from prison, adoption is the best chance for A.J. to achieve the stable family home that she needs. Therefore, finding

no merit to any of the arguments raised herein, Mother's sole assignment of error is overruled and the juvenile court's permanent custody determination is affirmed.

{¶ 49} Judgment affirmed.

S. POWELL and PIPER, JJ. , concur.