[Cite as *In re R.B.*, 2023-Ohio-3146.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| R.B. | : | CASE NO. CA2023-04-035 |
| | : | O P I N I O N<br>9/7/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20-D000083

Dearie, Fischer & Martinson, LLC, and John A. Fischer, for Mother.

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Clouse Law Firm Co., LPA, and Lauren L. Clouse, for appellant.

The Logsdon Law Office, LLC, and Brooke L. Logsdon, for CASA.

**S. POWELL, P.J.**

{¶ 1} Appellant, the father of "Roger," appeals the decision of the Warren County

Court of Common Pleas, Juvenile Division, granting permanent custody of the child to

Warren County Children Services ("the Agency").[1]  For the reasons outlined below, we affirm the juvenile court's decision.

{¶ 2}  On December 18, 2020, the Agency filed a complaint alleging that Roger, a child born on December 14, 2020, was a dependent child.  The complaint states that Mother was diagnosed with borderline personality disorder, post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), chronic depression, and anxiety, but stopped taking medications for her mental health in 2016.  Mother exhibited cutting behaviors and was last hospitalized for a suicide attempt in 2018.  While at the hospital for Roger's birth, Mother claimed that she saw things coming out of the walls.

{¶ 3}  The complaint further alleged that Mother had difficulty caring for Roger while at the hospital, including difficulties breastfeeding the child.  Due to complications in producing sufficient breastmilk, the child was not receiving full feedings and did not produce any urine or feces for the first 24 hours after his birth.  Mother was resistant to using formula to supplement her breastmilk, and due to the lack of nutrition, Roger had lost one-half pound since birth.  The complaint also alleged that Mother was agitated with Roger at the hospital and lacked any problem-solving skills to resolve her increasing anxiety, frustration, and annoyance with Roger's needs.

{¶ 4}  Regarding Father, the complaint alleged that although he lived with Mother, he worked 12 hours per day.  Mother did not want anyone around the baby when she returned home from the hospital, and refused any help taking care of Roger until he was old enough to speak.  The complaint indicated Mother did not make much progress in caring for Roger between December 14, 2020 and December 18, 2020, despite help from the hospital.

---

1. "Roger" is a pseudonym adopted in this opinion for purposes of privacy and readability.

{¶ 5} Following a hearing, the juvenile court granted emergency temporary custody to the Agency and Roger was placed in a foster home. The juvenile court appointed counsel for Mother and Father, as well as a court appointed special advocate ("CASA") to represent Roger, and counsel to represent CASA. Approximately two months later, in February 2021, Roger was placed with his current foster mother in a foster-to-adopt home.

{¶ 6} On February 17, 2021, Roger was adjudicated dependent. After a dispositional hearing on March 17, 2021, the Agency was awarded temporary custody of the child, and he returned to the foster home.

{¶ 7} The Agency prepared a case plan with reunification as the goal. The case plan indicates the Agency wanted Father to obtain and maintain safe and stable housing; demonstrate mental health stability; obtain and maintain employment and provide a steady source of income; and to not associate with any known substance abusers. The case plan also noted concerns regarding Father's parenting, including working 12-hour shifts, as well as his lack of engagement with Roger during visits. To address the Agency's concerns, the case plan required Father to submit to random drug screens; submit to a psychological evaluation and follow all recommendations; complete a mental health assessment and follow all recommendations; and to sign all necessary releases for the Agency. The case plan identified similar concerns for Mother, but also detailed the Agency's concerns relating to her mental health and cognitive abilities.

{¶ 8} Mother and Father made progress on their case plans and as a result, the juvenile court extended temporary custody twice throughout the case. The Agency also expanded the parents' visitation time with Roger, which advanced from four hours of supervised visitation at the Agency to two four-hour visits per week at maternal grandmother's home, where the couple was living at the time. Four hours of their visitation time was unsupervised, while the remaining four hours were supervised by an employee

from Agape for Youth ("Agape"), a program that works with families through either enhanced visitation or reunification services. In May or June of 2022, Father was awarded eight additional hours of unsupervised visitation time, however, he did not take advantage of the additional time with Roger.

{¶ 9} On November 28, 2022, approximately one month following the final extension of Mother and Father's visitation time, CASA moved to terminate Mother and Father's parental rights and for an order awarding permanent custody of Roger to the Agency. While the motion was pending, Mother and Father continued exercising their eight hours of visitation time with Roger. Thereafter, on March 6 and 14, 2023, the juvenile court held a two-day hearing on CASA's motion. During the hearing, the juvenile court heard testimony from 11 witnesses, including Mother, Father, Roger's foster mother ("Foster Mother"), a caseworker and caseworker supervisor from the Agency, Roger's CASA, the psychology assistant who conducted Mother's psychological assessment, two family support specialists from Agape, an employee from Help Me Grow, and Mother's former mental health therapist. In addition to testifying at the permanent custody hearing, Roger's CASA also submitted a report recommending that permanent custody be awarded to the Agency.

{¶ 10} On March 21, 2023, the juvenile court issued a decision granting permanent custody of the child to the Agency. In analyzing the best interest factors, the juvenile court found that Roger is bonded to his foster family and is doing well. It further found that Roger's need for a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency, as Mother and Father are unable to meet Roger's needs, despite having ample time to remedy the conditions that caused his removal from their care. The court noted that Mother chooses to ignore her mental health issues and is incapable of parenting Roger or understanding what he needs. The court detailed its concerns regarding

- 4 -

Father, including his lack of knowledge regarding Mother's mental health issues, as well as his reliance upon Mother for housing due to his undocumented status and lack of support outside of the home. The court ultimately concluded that the best chance for Roger was adoption and that awarding permanent custody to the Agency was in Roger's best interest.

{¶ 11} Father now appeals the juvenile court's decision granting permanent custody of Roger to the Agency, raising the following assignment of error for our review:

{¶ 12} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILD, PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 13} On appeal, Father argues the juvenile court erred in finding, by clear and convincing evidence, that it was in the best interest of Roger to grant permanent custody to the Agency.

{¶ 14} Before a parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's

decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 15} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

{¶ 16} Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the

child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12.

{¶ 17} In this case, the juvenile court found by clear and convincing evidence that the child had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period. The juvenile court also found that the child could not be placed with Mother or Father within a reasonable period of time, or should not be placed with them. Father does not dispute that the child has been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period and concedes this finding is supported by the record. As noted above, only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the two-part permanent custody test. *Id.* As such, because Father does not challenge the juvenile court's "12 of 22" finding, we need not review the issue further. *In re G.A.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 43.

{¶ 18} In light of the above, the only issue remaining is whether an award of permanent custody to the Agency was in the child's best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but

are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.,* 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22, citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re B.M.,* 12th Dist. Clinton Nos. CA2022-11-028, CA2022-11-029, and 2023-Ohio-1112, ¶ 54.

{¶ 19} Based upon its consideration of the R.C. 2151.414 factors, the juvenile court found that it was in Roger's best interest to grant permanent custody to the Agency. On appeal, Father argues the juvenile court's finding was in error, as the testimony at trial revealed that Father positively interacts with Roger and that he could successfully parent Roger. Father also claims the criticisms noted by the court, namely his failure to obtain independent housing, working too much, lack of a driver's license, and his status as undocumented, are not justifiable reasons for permanently severing his parental rights. After our review of the entire record, we find no merit to Father's claims.

{¶ 20} While the testimony at the permanent custody hearing largely focused on

Mother's mental health diagnoses and her inability to parent Roger, it also revealed that Father is entirely codependent upon Mother for housing and childcare, yet remains oblivious to the serious concerns relating to her mental health and ability to care for Roger. Beginning with the couple's relationship, the record indicates that Mother and Father have engaged in a somewhat strained relationship for approximately four years. The Agency had concerns regarding the nature of their relationship, including Mother's statement that she stays with Father because he "fill[s] certain" sexual and financial "needs" for her, as well as Father's reliance upon Mother for housing and other necessities he cannot obtain due to his undocumented status. Neither Father nor Mother have a driver's license, but Father drives himself and Mother when necessary. Father does not speak English and relies upon Mother to translate for him if no translator is present during visits. At one point, Mother stopped translating for Father because she became unhappy with the Agape family support specialist.

{¶ 21} The testimony at the hearing also revealed that the Agency had many concerns relating to the parenting of Roger. Specifically, the Agency remained concerned regarding Mother and Father's ability to co-parent Roger, as well as Father's ability and desire to reunify with and parent Roger on his own. Regarding the couple's co-parenting, the record reflects that Mother struggled to allow Father to parent Roger without her interference or direction. According to the caseworker supervisor, Mother was easily frustrated by Father and did not like the way he performed basic tasks like changing Roger's diapers or feeding him. As a result, Father tended to step away from Roger. Additionally, the couple bickered frequently, including in front of the child, and Mother kicked Father out of their home on several occasions. Even when no translator was present, others understood Mother and Father were bickering based upon their demeanor and actions toward one another. The couple has also engaged in physical altercations in front of the

child, including one occasion where Mother smacked Father hard on the arm and another where she threw a pair of shoes at him. Roger has displayed an increase in aggressive behavior after his extended visits with his parents and was described as staring wide-eyed when Mother and Father were bickering.

{¶ 22} There were also concerns regarding recent changes to Father's behavior during visits. Although Father typically followed Mother's lead during visits with Roger, he was initially very engaged and interacted appropriately with Roger. However, in the weeks and months preceding the permanent custody hearing, the CASA noticed Father's behavior had changed, and that he was not as involved with the child and tended to allow Mother to take care of Roger on her own. Father did not assist Mother when she was visibly frustrated and yelling at Roger, which was different from earlier visits where he would step in if Mother was having difficulties. As a result of this change in behavior, the CASA observed that Roger did not go to Father for comfort like he had in the past.

{¶ 23} Regarding Father's ability to parent Roger on his own, the record reflects Father did not take advantage of any opportunity to visit Roger without Mother. In the summer of 2022, Father was awarded an additional eight hours of unsupervised visitation with Roger. Due to his belief that the visits were cancelled because of issues with transportation, Father did not exercise any of the additional time with Roger. The transportation issues related to Father's reliance on maternal grandmother for transportation. The record indicates the caseworker spoke with Father "on multiple occasions" regarding the additional visitation, and indicated that, although maternal grandmother was not approved to transport after improperly buckling Roger's car seat in the past, Father could provide alternative transportation options or take advantage of other Agency resources like transit tickets. Mother and Father elected to provide a list of alternate transportation options, but the named individuals never responded to the Agency, and

Father never followed up on his additional visitation time. Instead, and because he could not locate anyone other than maternal grandmother with a valid license, Father chose to do nothing.

{¶ 24} The Agency also noted concerns regarding Father's ability to parent Roger on his own due to his demanding work schedule and reliance upon Mother for childcare and housing. Father works for a construction company in Liberty Township, Ohio. When the complaint was filed, Father was working 12-hour days, six or seven days a week. Father indicated he could not be Roger's primary caretaker at that time without Mother's help. By the time of the permanent custody hearing, Father had reduced his work schedule to nine-hour days on Monday through Thursday, an eight-hour day on Friday, and four hours on Saturday. If Roger was returned to his care, Father planned to have Mother care for the child while he worked.

{¶ 25} In addition to childcare, Father also relies upon Mother for housing, which was a major concern throughout the case. Prior to Roger's birth, the couple lived in a trailer with friends. Shortly before Roger was born, Mother and Father moved in with maternal grandmother. Although Father testified Mother and maternal grandmother had a "normal" relationship, the record indicates they have had an inconsistent relationship since Mother was young, and that maternal grandmother is responsible for some of Mother's mental health diagnoses and most of her past traumas. Although Mother testified that she and maternal grandmother get along, she also stated they argue a lot and that maternal grandmother oftentimes wants Mother and Father out of the home. Mother and maternal grandmother were involved in physical altercations in the home, including one occasion in 2022 where maternal grandmother kicked in Mother's bedroom door and attacked Mother with a broom. Notably, the Agency recommended family therapy to address some of these concerns, but maternal grandmother refused to participate. As a result of the hostile

relationship between Mother and maternal grandmother, the Agency considered the home environment to be toxic.

{¶ 26} Throughout the case, multiple providers worked with Mother and Father to find alternative housing but were ultimately unsuccessful in doing so. In February 2022, Father informed the caseworker that he had been looking for an apartment but planned to buy a house after saving enough money. By the time of the permanent custody hearing, Father's housing situation had not changed, despite another year passing and applying for approximately 30 apartments. Father testified he and Mother now planned to buy a trailer and to buy a house after Mother's credit improved, but he was unsure when that would happen, as he was unfamiliar with the process in the United States.

{¶ 27} The record indicates that much of Mother and Father's difficulty in finding independent housing related to Father's status as undocumented and Mother's status as a resident. Although the Agency did not consider Father's status as undocumented to be concerning on its own, it remained concerned that his status inhibited him from acquiring independent housing. Father and Mother testified that obtaining citizenship would alleviate their issues with finding housing, as well as receiving their licenses, but neither party had taken any legitimate steps toward changing their legal status at the time of the hearing. Father indicated he spoke with an attorney at one point, but decided not to pursue citizenship at that time because the process would have taken three to four years to complete. Mother, on the other hand, relied upon maternal grandmother to assist her with the citizenship process. Thus, in light of their inability to obtain independent housing, Mother and Father planned to continue residing with maternal grandmother if Roger was returned to their care.

{¶ 28} The testimony at the hearing reflects that, although the Agency did not have the same concerns with Father's mental health as it did with Mother's, it was concerned that

Father does not understand the significance of Mother's mental health illnesses. At the hearing, evidence was presented that Mother has an extensive history of mental health concerns, including significant past trauma relating to sexual assault by relatives when she was a child, as well as sexual assault perpetrated by men maternal grandmother allowed to live in her home. Mother began mental health treatment at 16 years old and had been hospitalized for mental health issues more than 15 times. Mother has a history of self-harm and suicide attempts, which have persisted throughout the case. Notably, Father and Foster Mother had noticed marks on Mother from where she had been self-harming, and there were reports that Mother had suicidal ideations as recently as the fall and winter of 2022.

{¶ 29} After an assessment in 2021, Mother was diagnosed with borderline personality disorder ("BPD"), which is "a set of maladapt personality traits that create difficulties in an individual's interpersonal relationships." Common symptoms of BPD include frequent threats of harm, turbulent interpersonal relationships, impulsivity, and rapid mood changes. Mother was also diagnosed with unspecified anxiety disorder by history, cannabis use disorder moderate in early remission, unspecified depressive disorder by history, intellectual disability mild, PTSD by history, and a "rule out" diagnosis for excessive compulsive personality disorder and OCD.

{¶ 30} The most effective way to treat BPD is through a process called dialectical behavioral therapy ("DBT"), which is an intensive combination of individual and group therapies that typically lasts two years. Given her diagnoses, it was the psychology assistant's clinical opinion that Mother should engage in individual therapy, as well as group therapy, using the DBT methods. Despite these recommendations, Mother discontinued DBT after three months, and had disengaged from therapy entirely by the time of the permanent custody hearing.

{¶ 31} In early 2022, Mother's former therapist became concerned when Mother asked for a diagnosis assessment update, which occurs when a client feels he or she has been misdiagnosed. At that time, the therapist concluded Mother was not reporting symptoms of BPD. A few months later Mother reported that she agreed with the BPD diagnosis, but her boyfriend, Father, had instructed her to say that she did not have the disorder in order to "get the baby back faster." At the hearing, Father denied that he instructed Mother to dispute her diagnosis, but Mother later acknowledged that he had done so. Additionally, the supervisor testified that Father encouraged Mother to misrepresent her symptoms to her providers on several occasions.

{¶ 32} Mother tended to downplay her therapist's concerns and would respond that everything was going smoothly or was fine, a pattern noticed by the caseworkers as well. Towards the end of his sessions with Mother, the therapist felt Mother was giving push back on the things he was attempting to address with her and that, due to her lack of response to him, he could not progress any farther with Mother on an individual basis. As a result, he suggested that group therapy would be the best treatment for her at that time. A few months after this recommendation, Mother requested to discontinue therapy entirely, which her therapist did not support. Nonetheless, Mother had ceased all therapy by the time of the hearing, and believed she could fix her mental health problems with "sheer determination." Mother had also stopped taking any medication for her mental health, despite being prescribed several, for reasons like potential weight gain and a friend's recommendation.

{¶ 33} Although Mother testified she was making strides in her mental health, Foster Mother recently observed cutting marks on Mother's arms and Mother attempted to commit suicide in February 2022. Father testified he was unaware that Mother had attempted suicide in February 2022, as Mother had informed him that everything was fine at that time.

On a separate occasion in February 2022, Mother was placed on a 72-hour hold at the Lindner Center due to statements to her caseworker that she would kill herself if the caseworker did not "give the baby back."  The Lindner Center recommended Mother to complete in-patient services, but she did not do so.

{¶ 34} When discussing Mother's mental health, Father initially testified he was unaware of Mother's existing issues, but later acknowledged he knew Mother had mental health issues because of the trauma she suffered when she was a child.  Father indicated he did not like to ask Mother about her past traumas, nor did he ask what her therapy sessions were about.  Although Mother testified that she and Father discussed her mental health concerns and therapy sessions, Father indicated to the caseworker that he did not know much about Mother's mental health, aside from her mood changes, and that she was on medication.  According to Father, he learned the specifics of Mother's mental health issues throughout the instant proceedings.

{¶ 35} Despite Mother's efforts, the record reflects many of Mother's former therapist's concerns existed at the time of the permanent custody hearing.  Most importantly, Mother continued to have trouble with her interpersonal relationships, and the denial of her existing mental health problems inhibited her from developing a normal parent-child bond with Roger and from engaging with him in an appropriate way.  Mother also has difficulty reading Roger's cues and her providers are concerned she is not capable of understanding Roger's developmental stage or needs.  Given these concerns, Mother's decision to address her mental health issues on her own, without the assistance of trained professionals or medication, emphasizes her inability to understand the seriousness of her diagnoses and their impact on her ability to parent.  Father likewise fails to appreciate or understand the severity of Mother's mental health, nor does he recognize its effect on her ability to care for Roger in an appropriate manner.  This is especially troubling considering

Mother's mental health was a primary reason for Roger's removal from the parents' care in 2020. Father's indifference to Mother's mental health is also concerning given the extent of Mother's mental health history, her specific diagnoses, and the time she has spent either hospitalized or in treatment.

{¶ 36} The record also reflects the Agency was concerned with Father's desire to reunify with Roger independently. Specifically, the Agency believed Father lacked any initiative throughout the case, and never showed a willingness to reunify with Roger independently. To that point, the caseworker testified that after Mother's suicide attempt and commitment to the Lindner Center in February 2022, the Agency informed Father of the steps he would need to take in order to reunify with Roger. The first step was separating himself from Mother. According to the caseworker, a translator was present during this conversation and Father understood at that time that he needed to find housing separate from Mother. As discussed above, Father made no progress in obtaining separate housing by the time of the permanent custody hearing and had not otherwise separated from Mother.

{¶ 37} After carefully reviewing the record, and in light of all of the above, we find the juvenile court's determination regarding the best interest of Roger is supported by clear and convincing evidence and was not against the manifest weight of the evidence. Although there was testimony that Father interacted well with the child, could have provided for him, and could have eventually reunified with him, Father did not take the necessary steps to do so. Although he completed some case plan requirements, it is well established that the completion of certain case plan requirements does not preclude a grant of permanent custody. *In re Mraz*, 12th Dist. Brown Nos. CA2002-05-011 and CA2002-07-014, 2002-Ohio-7278, ¶ 13; *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 35 ("case plan is merely a means to a goal and not a goal in itself"). Here, despite Father's progress on his case plan, several serious concerns remained at the time of the permanent

- 16 -

custody hearing. Ultimately, the record reflects that Father is unable to care for Roger without the assistance of Mother, and Mother does not understand how to properly care for Roger due to her untreated and unmedicated mental illnesses.

{¶ 38} "A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. In this case, the Agency has been involved with Roger since his birth in 2020. Thus, at the time of the permanent custody motion, Father had been given approximately two years to remedy the Agency's concerns. During this time, Father took no initiative to rectify his situation, and instead ignored Mother's mental illness and focused on making her appear "better" to her various providers. This behavior highlights Father's codependency on Mother to parent and reunify with Roger. As correctly found by the juvenile court, Roger needs a legally secure placement, and Father has demonstrated that he cannot, or is unwilling to attempt to, provide such an environment for Roger within a reasonable time.

{¶ 39} The juvenile court, just like this court on appeal, must act in a manner that places Roger's best interest above all else. *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 54. The juvenile court's decision to grant permanent custody to the Agency does just that. *See, e.g., In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593 at ¶ 43 ("simply because [appellant] may have the ability to provide for [the child] does not mean it would be in the child's best interest to be placed in [his] care"). This is because, as the juvenile court noted, Roger has been out of the home for over two years and is now thriving in a stable and secure environment with his foster family.

{¶ 40} In light of all of the foregoing, we conclude that it is in the best interest of the child for permanent custody to be awarded to the Agency. As such, we find the juvenile

court's decision to grant permanent custody of Roger to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

{¶ 41} Accordingly, Father's assignment of error is overruled.

{¶ 42} Judgment affirmed.

PIPER and BYRNE, JJ., concur.