[Cite as *In re H.G.*, 2023-Ohio-4082.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| H.G., et al. | : | CASE NO. CA2023-06-069 |
| | : | O P I N I O N<br>11/13/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2019-0248, JN2020-0079, JN2022-0055

Ernst & Associates, and David E. Ernst, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Jeanine C. Barbeau, guardian ad litem for children.

Dawn S. Garrett, guardian ad litem for Mother.

**HENDRICKSON, P.J.**

{¶ 1} Appellant, the mother of A.G., K.G., and H.G. ("Mother"), appeals from a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughters to appellee, the Butler County Department of Job and

Family Services ("the Agency"). For the reasons discussed below, we affirm the juvenile court's decision.

{¶ 2} A.G. ("Alice"), born on November 19, 2016, K.G. ("Kelly"), born on June 18, 2019, and H.G. ("Holly"), born on April 27, 2020, were all born during the time Mother and Father were married.[1] Father did not participate in case plan services, did not attend the permanent custody hearing, and was found to have abandoned the children. Father did not appeal the juvenile court's decision granting permanent custody of the children to the Agency, and he is therefore not the focus of this opinion.

**Facts & Procedural History**

{¶ 3} In early May 2019, the Agency received a referral of possible sexual abuse against Alice. The claim was investigated and was unsubstantiated. Later that month, the Agency learned that both Mother and Father had been arrested on May 17, 2019. Mother was arrested on an outstanding warrant from Fairfield County on charges of theft and forgery. Father, who had prior convictions for domestic violence, cruelty to animals, assault, criminal damaging, and child endangering, was arrested and charged with animal cruelty, resisting arrest, and disorderly conduct. Alice had been left in the care of a paternal uncle, who was an unsuitable caregiver. On May 23, 2019, when Alice was two-and-one-half years old, the Agency filed a complaint in Case No. JN2019-0248 asserting that Alice was a dependent child due to her parents' arrests. On that same date, the juvenile court issued an emergency ex parte order granting the Agency temporary custody of Alice. Mother's and Father's contact with Alice was ordered to be supervised by the Agency.

{¶ 4} On June 18, 2019, the same date that Kelly was born, the Agency filed a complaint in Case No. JN2019-0276 alleging that Kelly was a dependent child due to her

---

1. The names Alice, Kelly, and Holly are pseudonyms adopted in this opinion for purposes of privacy and readability.

parents' arrests and the open case involving her older sister. That same date, the juvenile court issued an emergency ex parte order granting temporary custody of Kelly to the Agency, and limiting Mother's and Father's contact with the child to supervised visitation. Kelly was placed in the same foster home as Alice. Mother, who had been granted intervention in lieu of conviction on her forgery and theft charges, moved in June 2019 to Lancaster, Fairfield County, Ohio to live with her father, the children's maternal grandfather ("Grandfather"). Because Mother had moved out of Butler County and did not have a driver's license, Mother had trouble attending visitation with the children.

{¶ 5} On August 19, 2019, Alice and Kelly were adjudicated dependent. After a dispositional hearing held on October 21, 2019, the Agency was awarded temporary custody of the children. The children were appointed a guardian ad litem and the court adopted a case plan for Mother's and Father's reunification with the children. The case plan required that Mother and Father complete a psychological evaluation and follow through with any recommended treatment, participate in a domestic violence assessment and follow through with any recommended treatment, obtain and maintain stable, independent housing, obtain and maintain employment, manage their income in a manner that allowed them to provide for the children's basic needs, and successfully complete parenting education classes and utilize the learned parenting skills in their daily life while caring for the children.

{¶ 6} Mother began working on the case plan while exercising supervised visitation with the children. On August 31, 2019, Mother was granted an extended home visit with Alice and Kelly at Grandfather's residence in Lancaster. Grandfather was to supervise all contact Mother had with the children and Father was prohibited from having any contact with the children on this visit. On September 11, 2019, twelve days into the extended visit, it was reported to the Agency that the children had been left alone with Mother when

Grandfather went to work and that Father was having contact with the children. The Agency sent a caseworker to Grandfather's home to investigate the allegations. When the caseworker arrived, she found Mother home alone with the children. Mother admitted to allowing Father to visit with the children after Grandfather left for work. The children were removed from the extended visit and placed back into foster care.

{¶ 7} In February 2020, Mother's visitation was moved to the Family Healing Center ("FHC") in Butler County, where it has remained. When Holly was born on April 27, 2020, the Agency filed a dependency complaint in Case No. JN2020-0079. The Agency set forth the history of its involvement with the family and noted Mother and Father's 2019 arrests. The Agency sought to have Holly placed in Grandfather's temporary custody. The juvenile court issued an emergency ex parte order granting temporary custody of Holly to Grandfather on April 27, 2020.

{¶ 8} A few weeks later, on May 18, 2020, the Agency filed an amended complaint alleging that Holly was an abused, neglected, and dependent child. The complaint set forth allegations that Holly had been admitted to a hospital over concerns of failure to thrive. Holly's weight had dropped significantly below her birth weight and the hospital where Holly was being treated had reported concerns to the Agency about Grandfather's and Mother's ability to adequately care for the child. The hospital reported that Mother had to be consistently reminded to feed Holly and that Mother had stopped feeding Holly on several occasions after mistakenly believing that the baby was sleeping when Holly was, in fact, eating with her eyes closed. The hospital further reported that Grandfather lacked confidence in feeding the child and when he was provided with education on how to properly feed Holly, he made a statement that he was only caring for the child "temporarily and was not planning on doing this long term. Just until [Mother] gets herself together." The juvenile court issued an emergency ex parte order granting the Agency temporary custody of Holly

on May 18, 2020. Holly was placed in the same foster home as her two sisters.

{¶ 9} On July 21, 2020, the Agency withdrew the neglect and abuse allegations and Holly was adjudicated dependent. Disposition occurred on the same day, with the court ordering that Holly be placed in the Agency's temporary custody. The court adopted the same case plan requirements for Mother that existed in Alice's and Kelly's cases and appointed the same guardian ad litem for Holly that worked with Alice and Kelly. Mother was granted weekly visitation with Holly.

{¶ 10} From July 2020 through August 2021, Mother continued to work on the case plan. She obtained a psychological evaluation, which confirmed prior diagnoses of bipolar II disorder and posttraumatic stress disorder and resulted in a new diagnosis of borderline intellectual functioning. Mother started seeing a psychiatrist at New Horizons in Lancaster and taking prescribed medication for her mental illnesses. She also started seeing a counselor, Baily Collins, at Integrated Services in Lancaster. Mother enrolled in parenting classes at Development of Living Skills ("DLS") and exercised weekly visitation at FHC with her daughters, though she continued to have transportation issues. For a significant part of 2020, visitations were held virtually due to COVID-19 restrictions. By August 2020, in-person visitations had returned to FHC. Because Mother lived out of county and sometimes struggled to get to FHC for in-person visits, virtual visits were permitted in 2021 and 2022. In 2021, Mother cancelled more than a dozen visits with the children and provided a variety of reasons for the cancellations, including transportation issues, illnesses, scheduled vacations, medical appointments, and attending a funeral.

{¶ 11} Mother's virtual visits with the children lasted anywhere from 10 minutes to 30 minutes, depending on the attention span of the children. To Mother's frustration, in-person visitation at FHC never progressed beyond Level 2 visits, which meant that Mother was always supervised by an FHC worker when visiting with the children.

{¶ 12} On January 25, 2021, the Agency moved for permanent custody of Alice and Kelly. A motion for permanent custody of Holly was filed by the Agency on September 2, 2021. In the motions, the Agency indicated that permanent custody was in the best interest of the children, that professionals involved in the children's cases indicated no further treatment plan could be formulated for the children's parents, and it did not appear that the parents could ever provide adequate parental care for the children.[2]

{¶ 13} After numerous delays and continuances, a hearing on the Agency's motions for permanent custody was held before a magistrate on January 10 and 17, 2023. Prior to the hearing commencing on January 10, 2023, the children's guardian ad litem filed a report stating that a grant of permanent custody to the Agency was in the children's best interest. In recommending permanent custody be granted, the guardian ad litem noted the significant amount of time the children had been in the Agency's custody and Mother's failure to remedy the condition that led to the children's removal from her care; that is, Mother's inability to safely care for the children.

{¶ 14} At the permanent custody hearing, the magistrate heard testimony from the children's former caseworker, the director of FHC, a visitation supervisor from FHC, a case manager from Integrated Services, the children's foster mother, Mother, Grandfather, a

---

2. Subsequent to moving for permanent custody, the Agency filed new dependency complaints for Alice and Kelly, respectively, in Case Nos. JN2022-0054 and JN2022-0055. The complaints filed under the new case numbers set forth the same dependency allegations contained under the earlier case numbers. The complaints were filed under new case numbers while the Supreme Court of Ohio decided a certified conflict regarding "whether a judgment granting temporary custody of a child is void or voidable when the dispositional hearing was held beyond the 90-day limit set forth in former R.C. 2151.35(B)(1)." *In re K.K.*, 170 Ohio St.3d 149, 2022-Ohio-3888, ¶ 1. Concerned that the supreme court could determine the proceedings in Alice's and Kelly's original cases were void, the Agency refiled the complaints under the new case numbers. The supreme court ultimately found that granting temporary custody of a child outside the 90-day limitation set forth in former R.C. 2151.35(B)(1) led to a voidable, not void, judgment. *Id.* at ¶ 62. Nonetheless, proceedings continued simultaneously for Alice and Kelly under all four case numbers (the two new and the two old case numbers). Alice and Kelly were adjudicated dependent children under the new case numbers on April 12, 2022, and were continued in the Agency's temporary custody following a dispositional hearing held on April 29, 2022. Motions for permanent custody of Alice and Kelly were filed on July 22, 2022 under the new case numbers. The juvenile court considered the Agency's motions for permanent custody of Alice and Kelly under both the old and new case numbers at the January 10 and January 17, 2023 hearing.

neighbor of Mother and Grandfather, and a church friend of Mother and Grandfather. Mother's counselor, Collins, was unable to attend the hearing due to a medical condition and the parties stipulated to the admission of a report Collins issued on January 6, 2023. Also admitted into evidence at the hearing were more than a dozen Social Summary reports prepared by the Agency, ranging in dates from June 27, 2019 through January 10, 2023, Readiness for Level Reduction-Measures Guidelines and Visitation Progress Notes from FHC, Mother's 2019 psychological evaluation, a December 2021 Exit Report from DLS regarding Mother's participation and progress in DLS programs, doctors' notes Mother presented to explain absences from visitations, a May 3, 2022 Assessment of Relative or Nonrelative Substitute Caregiver form completed by the Fairfield County Department of Job and Family Services recommending that Grandfather not be approved as a substitute caregiver for the children, emails Mother and Grandfather sent to Mother's attorney regarding events occurring in the children's cases, Mother's CPR and first aid certifications, a September 9, 2022 letter notifying Mother she did not qualify to receive services from the Fairfield County Board of Developmental Disabilities, a Mental Health Services Diagnostic Assessment for Mother completed by New Horizons in September 2022, letters written in support of Mother and Grandfather obtaining custody of the children, a typed statement from Mother, dated October 25, 2022, listing what she had learned from her psychiatry treatment, counseling, and parenting classes, and information about parenting classes being offered by the Fairfield County Family, Adult and Children First Council in the fall of 2022.

{¶ 15} The Agency caseworker who worked on Mother's case from June 2020 through September 2022 testified about the Agency's involvement with the family, Mother's progress on her case plan objectives, and concerns that remained about Mother's ability to safely care for the children. The caseworker explained that Mother obtained a psychological

assessment in 2019 with CDC Behavioral Health. After diagnosing Mother with bipolar II disorder, posttraumatic stress disorder, and borderline intellectual functioning, CDC Behavioral Health recommended that Mother (1) maintain her individual mental health therapy, (2) engage in parenting education, (3) complete an assessment for victims of domestic violence and follow all recommendations of the assessment, and (4) maintain her psychiatric care and take all prescribed medications. Mother engaged in psychiatric services through New Horizons in Lancaster and was prescribed mental health medication. In November 2019, Mother was hospitalized for three days due to suicidal ideations. At the time of her hospitalization, Mother was pregnant with Holly and had stopped taking some of her medications. Mother's medication was adjusted and there have been no further reports of hospitalizations for mental health reasons. Mother's mental health needs were reassessed by New Horizons in September 2022.

{¶ 16} In addition to the psychiatry care she receives, Mother engages in counseling services with Collins at Integrated Services in Lancaster. Though Mother reported she consistently saw Collins on a weekly basis, the Agency struggled with verifying this claim. Collins only provided sporadic reports to the Agency about Mother's progress in counseling. Over a two-year period, the caseworker only received three reports from Collins, despite the caseworker asking for more consistent reports on multiple occasions. Near the end of March 2022, Collins informed the caseworker that Mother no longer wished for Collins to share updates with the Agency about Mother's counseling progress. Mother was subsequently asked by the Agency to sign a release to allow the Agency to obtain records from Collins, but the Agency never received a signed release. At a semi-annual review hearing held in May 2022, Collins was present and reported to the caseworker that Mother was engaged and focused on processing past trauma, coping skills, and managing emotions.

{¶ 17} Mother completed a domestic violence assessment with Faith Based Counseling in June 2019, and it was recommended that she engage in services there. Mother did not engage in services at Faith Based Counseling, but claimed to have received some therapy involving domestic violence from Collins.

{¶ 18} Regarding Mother's housing and income, the caseworker testified that Mother lived in Grandfather's home in Lancaster. The caseworker stated the home was appropriate and did not present any safety concerns. As for Mother's employment and income, Mother had indicated she received "SSI and SSA" benefits in the amount of $923 per month. The caseworker was aware that Mother had briefly worked at an art studio as a teacher's aide, but was not working there as of the time of the permanent custody hearing.

{¶ 19} Mother voluntarily took some parenting education classes in June 2020 from the Fairfield County Family, Adult and Children First Council. However, because those classes were not "hands-on," the Agency referred Mother to DLS for parenting classes. Mother began parenting classes through DLS on October 2, 2020. After receiving three service extensions from DLS, Mother completed DLS classes on December 6, 2021. Mother was provided with 83 lessons on parenting and 14 lessons on communication with children. DLS observed that although Mother had completed all those classes, "there was little progress that was made. [DLS] still had concerns that she had plateaued in her progression of the services." Mother was only able to progress consistently to a "fair" rating of participation and progress. Mother struggled to retain knowledge of routines and required repetition of lessons. Mother was not able to independently practice skills and was "inconsistent in her participation and acceptance of the information given during lessons."

{¶ 20} DLS reported to the caseworker that a big barrier to Mother's progression was that she was out of county and DLS was unable to provide the hands-on support that they would typically provide to a parent who was local. Mother's caseworker noted that in Butler

County, there is a parenting and family support service that goes into the home and helps parents with the process of progressing to in-home visitation with children. The Agency attempted to find a similar service in Fairfield County, but was unable to locate one.

**{¶ 21}** The caseworker noted that DLS was able to virtually observe 24 visits Mother had with the children at FHC, which totaled more than 33 hours of observation. Although Mother came prepared for the visits, Mother was not able to maintain routines throughout the visits. DLS noted that FHC staff had to consistently prompt Mother to complete certain actions during visits, including cleaning up the visitation room and changing the children's diapers. DLS observed that Mother struggled with multitasking and with consistently following through with consequences when the children misbehaved or failed to listen. DLS also noted that despite conducting lessons on the need for the children to have consistency with visits and DLS encouraging Mother to prioritize her visits with the children, Mother missed multiple visits with the children because she scheduled medical appointments or took vacations during the scheduled visitations. The caseworker indicated that Mother's inconsistent visits negatively affected the children.

**{¶ 22}** The caseworker noted that Mother's visitation at FHC started at Level 1 visitation, which required the most intensive supervision FHC offered. In June 2021, Mother progressed to Level 2 visitation, which meant that the visits remained supervised the entire time but Mother was given more control over the visit. FHC never elected to move Mother beyond a Level 2 visitation due to ongoing safety concerns for the children.[3] However, pursuant to a March 4, 2022 entry from the juvenile court, FHC was ordered to move Mother to Level 3 visitations. The caseworker testified that though FHC moved Mother to Level 3

---

3. As described in paragraph 29, there are two additional levels of visitation at FHC, Level 3 visitation and Level 4 visitation. Both of these levels involve a parent exercising unsupervised visitation time with the children, with a Level 4 visitation being almost entirely unsupervised.

visitations on paper, FHC actually continued to treat the visitations as Level 2 visits to ensure the safety of Alice, Kelly, and Holly.

{¶ 23} Mother was unhappy that her visitations remained supervised at FHC, and she sent several emails to the caseworker and the director of FHC threatening to sue them for not progressing her visitation. Mother told the caseworker that she would be "paying for this for the rest of her life." The threatening emails caused the caseworker to have concern for Mother's mental health.

{¶ 24} The caseworker never personally observed Mother's visitations with the children at FHC. She did, however, visit the children monthly at their foster home and visited Mother in Lancaster once every other month. The caseworker testified that the children were in a loving, safe, and appropriate home and had bonded with their foster family. The caseworker investigated various complaints Mother had made about the care the children received in their foster home, which included complaints that the children were being spanked, had bruises on their bodies, and were dressed in unsuitable clothing and shoes. The Agency never found any validity to Mother's complaints.

{¶ 25} The caseworker testified that her ability to trust Mother and Mother's credibility with the Agency had been negatively affected by Mother's presentation of fraudulent doctors' notes. In May 2022, Mother reported that she had been injured in a car accident and that her injuries required her to miss multiple visits with the children. Mother presented a doctor's note from "Dr. Wyatt Foster DO," who allegedly practiced medicine at the Fairfield Community Health Center. The wording of the note, as well as the poor grammar used in the note, raised suspicion that the note was fraudulent. The caseworker and the FHC director attempted to verify the authenticity of the note. The caseworker testified that when she called the Fairfield Community Health Center to verify Mother's treatment there, the health center did not have any record of Mother seeking treatment as a result of a car

accident. They health center also informed the caseworker that they did not have a Dr. Wyatt Foster employed at any of their practices.

{¶ 26} Mother also presented a June 20, 2022 doctor's note from "Dr. Wyatt Foster, DO" and a December 2021 doctor's note from a "Dr. Darren Shui, DO" at the Fairfield Community Health Center. The latter note misspelled the doctor's name. Additionally, all three notes purporting to be from doctors working at the Fairfield Community Health Center had an inaccurate hospital logo on the top of them.

{¶ 27} Although Mother was engaged in case plan services for multiple years, the caseworker opined that Mother was not consistently making progress. The caseworker explained that the Agency was moving for permanent custody because of concerns about "mom's lack of insight in the children's needs and minimizing safety issues, inconsistency with visitations, * * * [and] lack of awareness of * * * safety for the children." The caseworker noted that the children needed a permanent home and despite the Agency's efforts, it had been unable to locate any family members who could care for Alice, Kelly, and Holly. A May 2022 assessment completed by the Fairfield County Department of Job and Family Services determined that Grandfather was not an appropriate substitute caregiver for the children as he would not be able to care for the children on his own and there were concerns about his ability to meet the children's needs.

{¶ 28} The director of FHC and the supervisor who had been observing Mother's visits at FHC since May 2021 both testified at the hearing about Mother's progress. Visitation Progress Notes from the facility indicated that from February 2020 through December 2022, Mother attended just over 100 visits, either virtually or in person. Over the years, Mother canceled nearly 30 visits. In 2020, Mother exercised 39 visits with the children through FHC. Only nine visits that year were able to be conducted in person. In 2021, Mother canceled 13 scheduled visits. Of the 37 visits that did occur that year, only

17 of the visits lasted an hour or longer. A number of the visits, per Mother's request, occurred virtually and lasted less than 30 minutes each. In 2022, Mother cancelled seven visits and only attended 24 visits in person. In May and June 2022, Mother cancelled multiple visits in a row, claiming that she could not attend due to having head lice, being in a car accident, and recovering from a car accident. The FHC director testified that the missed visits were rough on the children, as missed visits caused the children to experience anxiety and trauma. The FHC director further testified that there were times Mother presented doctors' notes when she missed visits. Four of the doctors' notes Mother provided were believed to be fraudulent, including the notes from "Dr. Wyatt Foster, DO" and "Dr. Darren Shui, DO."

{¶ 29} The visitation supervisor testified that he was assigned to Mother's case in May 2021 and since then, he had observed around 80 visits between Mother and the children. When he first began supervising visits, Mother was at a Level 1 visitation, which meant that the visitation was supervised the entire time and he worked with Mother to teach her parenting skills. As Mother's parenting skills, interaction, and engagement progressed, the center moved Mother to Level 2 visitations. While Level 2 visits are still supervised the entire time, the supervision is more relaxed and the parents are given more control over the visits. There are two visitation levels above a Level 2 visitation. At a Level 3 visitation, an FHC supervisor does not stay in the visitation room, but checks in on the visitation every 15 to 20 minutes to make sure the visitation is "going okay" and to make sure the children are safe. At a Level 4 visitation, the supervisor only checks in on the visit one time, after the first hour of the visit.

{¶ 30} In March 2022, the juvenile court ordered FHC to progress Mother to Level 3 visitations. The FHC director disagreed with Mother being placed at a Level 3. The director believed Mother was really at "about a level two. * * * And I use, and I say that graciously

because we are still giving her a * * * [the FHC supervisor is] still giving [M]other a lot of prompts. And so that's not indicative of a true level two (2)." Despite moving Mother to a Level 3 in FHC's system, the FHC director required the FHC supervisor to stay in the room for the entirety of Mother's visits to ensure the safety of the children.

{¶ 31} The FHC supervisor testified that Mother struggled at times to manage the visits. Maintaining safety continued to be an area of concern, despite the hands-on instruction Mother had been receiving at FHC for years. Mother had to be reminded frequently not to let the children climb up on furniture or move about the room while eating or drinking. Mother was encouraged by the FHC supervisor to have the children pick up toys once they had finished playing to prevent the children from falling over toys later, but Mother had to be prompted in multiple visits to pick up items to allow a safe walking space for the children. On one occasion, Mother stumbled over a toy truck on the floor and Kelly later fell over the same truck as it was never put away.

{¶ 32} Mother also struggled to respond to the children's needs independently and often needed the support of the FHC supervisor or Grandfather, if he was present, in order care for the children. Mother had to be prompted at most visits to change Holly's and Kelly's diapers. Mother continued to struggle with multitasking, frequently losing track of what one or two of the children were doing while she was focused on the third child. Holly was repeatedly observed eating items off the floor and picking things out of the trash when Mother was focused on Alice or Kelly. On multiple occasions one or two of the children were able to run out of the room and down a hallway while Mother changed the diaper of the third child. On at least one occasion, while Mother changed one of the children's diapers in the bathroom, the other two children played in toilet water. When individuals from FHC spoke with Mother about safety concerns they were still seeing, Mother became defensive and first accused the FHC workers of lying about events. She then stated, "What kid doesn't

climb on things and eat some off the floor and fall; that is [expletive] being a kid, get over it." The FHC supervisor testified that he never recommended Mother advance to Level 3 visitation because he had not "seen enough consistency to feel secure or safe with removing [his] eyes from the room."

{¶ 33} Mother's case manager at Integrated Services testified that Mother utilized Integrated Services to obtain counseling from Collins, for assistance in enrolling in parenting classes, and in arranging transportation to doctor's appointments. The case manager testified that Mother was usually on time and kept her appointments.

{¶ 34} Collins' January 6, 2023 report indicated that she had been providing Mother individual mental health counseling since August 2019 and that Mother attended weekly sessions ranging from 20 to 90 minutes. Interventions utilized during therapy to treat Mother's mental health diagnoses have included cognitive behavioral therapy, solution focused therapy, dialectal behavioral therapy, motivational interviewing, strength-based perspective therapy, and person-centered approach therapy. In addition to practicing symptom management and coping skills for Mother's mental health disorders, counseling sessions have also addressed past family trauma, domestic violence related trauma, family relations and dynamics, healthy boundaries, parenting styles, skills, and goals, self-care and healthy activities, and behavioral health medication adherence. Collins opined in the report as follows:

> In my professional opinion, [Mother] has a stable mental health status, as marked by her continued engagement in services, willingness to grow, commitment to mental health care and progress in treatment thus far. I do not have concern currently for [Mother] regarding her mental health. I do not see [Mother's] mental health as a barrier to her ability to provide long term parenting, protection, safety, and emotional/physical needs for her daughters.

Collins letter did not indicate that she had ever observed Mother's interactions with Alice,

Kelly, or Holly, that she had any knowledge of any fraudulent doctors' notes Mother produced to the Agency and FHC, or that she had any knowledge of threats Mother had made against the Agency or FHC when visitations did not progress as Mother had hoped.

{¶ 35} The children's foster mother testified that Alice and Kelly were placed in her home on August 13, 2019 and Holly was placed in her home on May 17, 2020. Other than the 12 days Alice and Kelly were on an extended visitation with Mother in September 2019, the children have remained in her care. The children are bonded to their foster parents and their foster parents' four adopted children. In addition to their adopted children, Alice, Kelly, and Holly, the foster parents foster an additional three children. Foster mother testified there is room for everyone in the family's 5,000 square foot home.

{¶ 36} Foster mother testified that the children are doing well in her home. For Kelly and Holly, the foster parents' home is the only home they have ever known. Though Alice spent the first two-and-one-half years in Mother's care, she has been in the foster parents' home for more than three years. As of the date of the permanent custody hearing, Alice was six years old, Kelly three years old, and Holly two years old. Foster mother testified she and her husband were interested in adopting the three girls if the Agency was awarded permanent custody.

{¶ 37} None of the children had been diagnosed with any special needs. Alice was in kindergarten and was doing excellently in school. Kelly and Holly were enrolled in daycare at Head Start and Kelly was also in preschool. Kelly received services from Help Me Grow to assist with speech development and Holly received services from Help Me Grow to assist with gross motor skills.

{¶ 38} Foster mother testified that the children are bonded with Mother, and Alice especially enjoys her visits with Mother. Foster Mother has stopped telling the children that they have a visit coming up with Mother because Mother's cancellations upsets them.

{¶ 39} Grandfather testified Mother began living with him after she was released from jail in 2019. He and Mother live in the home he purchased in Lancaster two years ago. The home has four bedrooms, is in a safe neighborhood, has a big backyard, and is ready for the children should Mother be given custody of the girls.

{¶ 40} Grandfather testified he has been teaching on and off for the past 33 years. He currently works with special needs children in grades 7 through 12 as a paraprofessional, or teacher's aide. In addition to teaching, Grandfather is a musician and is actively involved in his church.

{¶ 41} Grandfather testified he is not seeking legal custody of the children, but is supportive of Mother's reunification with the children. If Mother obtained custody of Alice, Kelly, and Holly, Grandfather was prepared to retire from teaching so that he would have more time to help Mother care for the children.

{¶ 42} Grandfather stated that Mother and the children are bonded and Mother is "very capable" of parenting Alice, Kelly, and Holly. He disagrees that Mother needs to be supervised when caring for the children and testified that Mother "usually" does not need assistance managing the three children on visits. Grandfather testified Mother prioritized her case plan, taking numerous parenting classes and working hard to make in-person visitations in Butler County. Grandfather testified that Mother's visitations are on Wednesday evenings and to ensure she is there in time for the visits, Mother asks Grandfather to drive her down to Butler County on Tuesday evenings, where she stays with a friend. Mother then gets herself from the friend's house to FHC for the visitation. Because Grandfather is unable to pick Mother up on Wednesday evenings due to church commitments, Mother must stay with her friend Wednesday nights and then Grandfather drives back to Butler County to pick Mother up on Thursdays after his workday finishes.

{¶ 43} Grandfather believes Mother has been consistent with visiting the children.

He was aware that Mother missed some visits after being in a car accident in May 2022. Mother also missed a visit after having gallbladder surgery.

{¶ 44} Mother testified she believed it was in the children's best interest for permanent custody to be denied and for the children to be put back into her care. She recognized that the children had been out of her care for a significant period of time—more than three-and-one-half years for Alice and Kelly and over two-and-one-half years for Holly—and that it would probably be best if the children were gradually reintroduced to her care. Mother had previously sought extended parenting time, but her requests were denied.

{¶ 45} Mother stated that she has done everything the Agency has asked of her. She not only completed parenting classes at DLS, but voluntarily took additional parenting classes offered by the Fairfield County Family, Adult and Children First Council. She also voluntarily obtained certifications in CPR and first aid care. Mother believes she can safely care for the children, and noted that she has a community of individuals who will help provide support for her and the children. This community includes Grandfather, various neighbors, and fellow church members.

{¶ 46} Mother testified that she has a plan in place for the children's care. Though the children and Mother will initially live with Grandfather in his home in Lancaster, which is large enough to accommodate everyone, Mother eventually wants to move into her own place with the children. She indicated that she is on a waitlist for HUD housing, Metropolitan housing, and Section 8 housing. Mother testified she has looked into schools in the area and noted that there is one "down the road" from Grandfather's home. Mother has talked to the school about enrolling Alice. Mother has also looked into enrolling Kelly and Holly in the YMCA Head Start program. Mother arranged a health care provider for the children. A nurse practitioner from Nationwide Children's Hospital submitted a letter indicating she was prepared to be the children's primary care provider. Mother indicated she has also lined up

a dentist and an eye doctor for the children.

{¶ 47} Mother stated that she has the financial ability to meet the children's needs. She receives "SSI and SSA" benefits of over $900 every month. She claimed that she also recently lined up a nannying job. She will be caring for three children, a 9-year-old, a 7-year-old, and a 3-month-old, who only live a couple of blocks away from Grandfather's home. Mother stated she will earn $510 per month from this venture. In addition to nannying, Mother testified she has been accepted into college and will be taking pre-law classes online through the Lancaster branch of Ohio University.

{¶ 48} Regarding her visitations with the children, Mother indicated her belief that she should have been granted unsupervised visitations long ago. Mother acknowledged that there had been past instances where one or two of the children ran out of the room or played in a toilet while she was busy changing another child's diaper, but Mother claimed those types of incidents no longer happened. Mother testified that she is able to watch all three children and care for their needs during visits. When the children engage in unsafe behaviors during visitations, she corrects their behaviors as soon as she sees the unsafe activity. She also uses a "time-out" punishment system during visitations to keep the children safe.

{¶ 49} Mother testified that she has been pretty consistent in exercising visitation with the children. There have been times when she missed visits due to illnesses, surgeries, having been injured in a car accident, or scheduled vacations. Mother denied presenting fraudulent doctors' notes to excuse her absences, contending that the notes from "Dr. Wyatt Foster, DO" and "Dr. Darren Shui, DO" were legitimate notes. Mother indicated that when she was injured in a car accident in May 2022, her injuries included three broken ribs, her knee being popped out of place, and pulled tendons in her knee and ankle. However, the doctor's note she presented from "Dr. Wyatt Foster, DO" identified different injuries.

Specifically, the note indicated Mother had "broken two ribs, her hips went completely out of socket. Which made her unbalanced and very stable walk [sic]. [S]he also had a concussion and hairline fracture on her pelvis."

{¶ 50} Mother testified she regularly and routinely attends her psychiatry and counseling appointments and faithfully takes the medication prescribed to treat her mental illnesses. With respect to her counseling appointments with Collins, Mother testified that she signed releases which would allow Collins to share information about her treatment with the Agency. Mother testified that through counseling sessions, she has learned how to avoid abusive and unhealthy relationships. Mother claims that she has not had any contact with Father for nearly two years. The last time she spoke with Father was in early 2021, when she spoke with him about him signing over his legal rights to the children. Mother also had not gotten in legal trouble since she was arrested in May 2019 on charges of theft and forgery. Mother stated she had successfully completed her intervention in lieu of conviction program.

{¶ 51} Both Mother's and Grandfather's neighbor and a friend from church testified that they believe Mother should be given custody of the children. Both individuals believed Mother had worked hard to improve herself and that the home Mother and Grandfather would provide the children would be appropriate and safe. They stated they were willing to serve as a support system for Mother if custody of the children was returned to her.

{¶ 52} After considering the foregoing testimony and the numerous exhibits presented by the parties, the magistrate issued a decision granting the Agency's motions for permanent custody of Alice, Kelly, and Holly. The magistrate noted that the parties had stipulated, and the evidence supported, a finding that all of children had been in the Agency's custody for 12 or more months of a consecutive 22-month period. The magistrate proceeded to address the best interest factors set forth in R.C. 2151.414(D)(1) and

determined that the children were in need of legally secure permanent placement, which could only be achieved with a grant of permanent custody to the Agency. In so finding the magistrate stated, in pertinent part, the following:

> [D]espite many months of therapeutic visitation and parenting education, there remain serous concerns about [Mother's] ability to actually care for these children safely and, perhaps more importantly, about her honesty. [Grandfather] appears to be a decent man but he has failed to abide by court orders regarding the safety of the children when they were placed in his home in the past.

{¶ 53} Mother filed objections to the magistrate's decision, contending that the decision was "manifestly unjust and not supported by the better weight of the evidence provided [to] the court." Mother argued that the court should have given more weight to Mother's completion of case plan services and the steps she had taken to demonstrate her readiness to care for the children. Following a hearing on Mother's objections, the juvenile court issued a decision overruling the objections and adopting the magistrate's decision in full.

**Analysis**

{¶ 54} Mother appealed the juvenile court's decision, raising the following as her sole assignment of error:

{¶ 55} THE TRIAL COURT'S DECISION TO AFFIRM THE PERMANENT CUSTODY DECISION OF THE MAGISTRATE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AT TRIAL AND REPRESENTS AN ABUSE OF DISCRETION.

{¶ 56} Before a parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile

court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.

**{¶ 57}** "However, '[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence.'" *In re R.B.*, 12th Dist. Warren No. CA2023-03-032, 2023-Ohio-3145, ¶ 17, quoting *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 18. In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

**{¶ 58}** Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental

rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12.

{¶ 59} In this case, the juvenile court found by clear and convincing evidence that each of the children had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period. Mother does not dispute this finding and has conceded that this finding is supported by the record. As Mother does not challenge the juvenile court's "12 of 22" finding, we need not review the issue further. *In re R.B.*, 12th Dist. Warren No. CA2023-04-035, 2023-Ohio-3146, ¶ 17.

{¶ 60} The only issue remaining is whether an award of permanent custody to the Agency was in the children's best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to

consider all relevant factors. *In re D.E.,* 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22, citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102 at ¶ 19.

{¶ 61} The record reflects that the court considered the best interest factors set forth in R.C. 2141.414(D) and found that it was in Alice's, Kelly's, and Holly's best interest to grant permanent custody to the Agency. Mother challenges the court's finding, contending the court did not give sufficient weight to the bond and relationship the children have with her, her completion of case plan objectives, or the fact that she had a plan in place and had made arrangements for the children's care if they were returned to her custody. Mother contends the court should have denied the Agency's motions for permanent custody and granted her custody of the children with the Agency having protective supervision.

{¶ 62} After our review of the record, we find no merit to Mother's arguments. The juvenile court's determination regarding the best interest of Alice, Kelly, and Holly is supported by clear and convincing evidence and was not against the manifest weight of the evidence. Though evidence was presented that Mother and the children are bonded and that the children appear to have a relationship with Grandfather, this is but one factor in the best interest test. "[N]o one factor [in the best interest test] is entitled to more weight than the other factors." *In re A.C.*, 10th Dist. Franklin Nos. 22AP-243, 22AP-244 and 22AP-255 thru 22AP-257, 2023-Ohio-836, ¶ 54, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 63} Furthermore, while the court considered the children's relationship with Mother and her family, it also appropriately considered their custodial history, their current living situation, and their relationship with the foster family. The juvenile court noted that Alice, Kelly, and Holly are all doing well in their foster home, where the children have been "incorporated into [a] large family" that expressed an interested in adopting them. Besides a 12-day extended visit with Mother and Grandfather in September 2019 for Kelly and the first three weeks of Holly's life, the only home Holly and Kelly have ever known is that of their foster family. Kelly and Holly were removed from Mother's care and placed in the Agency's temporary custody on June 18, 2019 and on May 18, 2020, respectively. Alice spent the first two-and-one-half years of her life in Mother's home, but she was removed from Mother's custody on May 23, 2019. For the past three years, Alice has been in the foster family's home. Though six-year-old Alice, three-year-old Kelly, and two-year-old Holly were too young to share their custodial wishes with the court, the court did consider the guardian ad litem's recommendation that permanent custody be granted to the Agency.

{¶ 64} The juvenile court also considered Mother's progress on case plan services, the children's need for a legally secure placement, and whether such placement could be

achieved without a grant of permanent custody to the Agency. As an initial mater, we note that even where a parent completes all case plan services, that "does not equate to, or necessitate, a finding that the parents have substantially remedied the conditions that caused the removal of the child[ren] from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶ 65} In the present case, the juvenile court noted that Mother demonstrated "tenacity in this case" and she was actively engaged in case plan services. Mother obtained a domestic violence assessment and psychological evaluation, was participating in mental health therapy and case management in Fairfield County, and had been undergoing treatment and taking medication for her mental health diagnoses. There was some concern expressed, however, by the Agency with respect to the progress of Mother's mental health treatment, as the Agency was unable to obtain frequent updates from Mother's mental health counselor, Mother had sent threatening emails to the Agency and the FHC director when her visitation was not progressed beyond Level 2 supervision, and Mother had produced multiple fraudulent doctors' notes. The juvenile court was troubled by Mother's presentation of the fraudulent doctors' notes and indicated that it had "serious concerns about * * * [Mother's] honesty." The court found that there was reason "to question [M]other's credibility. Any reference to information provided by her must be viewed through that lens."

{¶ 66} Though Mother had not demonstrated steady employment, she did have a

steady income from monthly SSI and SSA benefits. Mother demonstrated that she has a stable, suitable home with Grandfather. Though the juvenile court found that Grandfather "appear[ed] to be a decent man," the court was troubled by Grandfather's failure to abide by prior court orders regarding the safety of the children when they had been placed in his home in the past. Grandfather had allowed Mother unsupervised visitation with the children and failed to ensure that Father was not permitted visitation with the children in September 2019. When Holly had been placed in his custody in April 2020, Grandfather had not been able to adequately care for the child and she was hospitalized for failure to thrive. Additionally, Grandfather, who served as Mother's primary source of support, was not approved as a substitute caregiver for the children in a May 2022 assessment by the Fairfield County Department of Job and Family Services.

{¶ 67} Although Mother completed parenting classes through DLS, she failed to demonstrate that she was capable of using the parenting skills in her daily life while caring for the children. Despite completing 83 lessons on parenting and 14 lessons on communication with children and having more than 100 therapeutic, supervised visitations with the children, Mother was only able to progress to a "fair" rating of participation and progress in parenting skills. Mother was not able to independently practice the skills taught by DLS and was inconsistent in her participation and acceptance of the information provided to her. She struggled to establish routines with the children and failed to prioritize her visits with the children over personal appointments or vacations, thereby causing the children to experience anxiety and trauma.

{¶ 68} Despite the multiple parenting classes she completed and the numerous corrections she received from DLS workers and FHC staff who supervised her visitations, Mother failed to demonstrate that she could manage the safety and well-being of the children. Every individual who observed Mother's interactions and visitations with the

children, apart from Grandfather, indicated that the children could not be safely left alone with Mother. Mother struggled to multitask and had difficulty when the children presented her with simultaneous or nearly simultaneous needs, often having to rely on whoever else was in the room with her to help meet the children's needs. Mother had to be reminded time and time again of the need to change the children's diapers, to stop the children from climbing up on chairs, bookcases, or other furniture, to stop the children from eating food off the floor, to stop them from picking items out of the trashcan, to stop the children from moving around the room while eating or drinking, and to clean up play areas so the children did not fall and hurt themselves. Mother failed on multiple occasions to keep her eyes on the children and the children were able to engage in unsafe activities, such as running out of the visitation room and playing in toilet water in the bathroom. Mother failed to demonstrate that she could ensure the children's safety, even when inside a small, controlled environment for a limited period of time.

{¶ 69} When FHC staff spoke with Mother about safety concerns they observed, Mother often became defensive and downplayed the concerns. Mother believes many of the safety concerns identified by FHC staff are common behaviors by children, and not something that should be held against her. Mother clearly believes that she should have been granted unsupervised visitation and additional parenting time with the children. She argues in her appellate brief that she should be given custody of the children, with the Agency exercising protective supervision. As this court has previously stated, "a child's life is not an experiment that can be left to chance." *In re S.S.*, 12th Dist. Clermont No. CA2023-04-020, 2023-Ohio-2916, ¶ 20. "'The law does not require the court to experiment with [a] child's welfare to see if [the child] will suffer great detriment or harm.'" *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53. Instead, "the law * * * requires

the juvenile court act in a manner that, to the extent possible, serves the best interest of the child." *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 39.

{¶ 70} "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60. The juvenile court's decision does just that. The children have been in the Agency's custody since being removed from Mother's home in May 2019 for Alice, June 2019 for Kelly, and May 2020 for Holly. Despite diligent and reasonable efforts by the Agency to improve Mother's parenting skills through therapeutic visitation and parenting education, Mother has been unable to demonstrate the ability to safely care for the children. Alice, Kelly, and Holly are in need of secure, permanent placement, and it is in their best interest for permanent custody to be awarded to the Agency. Therefore, in light of the aforementioned considerations, we find the juvenile court's decision to grant permanent custody of Alice, Kelly, and Holly to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's sole assignment of error is overruled.

{¶ 71} Judgment affirmed.

M. POWELL AND BYRNE, JJ. concur.